IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DONALD DeLANGHE, | ) | |
| | ) | |
| Plaintiff, | ) | 8:05CV299 |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT L. CONLEY; ROBERT L. CONLEY LIVESTOCK, LLC; and PRODUCERS LIVESTOCK MARKETING ASSOCIATION, | ) ) ) ) | MEMORANDUM AND ORDER |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on the motions for summary judgment filed by defendants Robert L. Conley, Robert L. Conley Livestock, LLC (collectively "Conley") (Filing No. 77), and Producers Livestock Marketing Association ("PLMA") (Filing No. 80). Having reviewed the motions, the parties' briefs and evidentiary submissions, and the applicable law, the Court finds that Conley's motion should be granted in part and denied in part and that PLMA's motion should be granted.

**BACKGROUND**

Plaintiff Donald DeLanghe ("DeLanghe") is a citizen and resident of the State of Minnesota. Defendant Robert L. Conley is a citizen and resident of the State of Kentucky and is a member and manager of defendant Robert L. Conley Livestock, LLC ("Conley Livestock"). Conley Livestock is a Kentucky limited liability company with its principal place of business in Lexington, Kentucky. PLMA is a Nebraska non-stock cooperative

corporation with its principal place of business in Omaha, Nebraska (Filing Nos. 1, 26, & 28 ¶¶ 1-4).

Plaintiff is a self-employed farmer who makes a living buying, raising, and selling cattle.  Plaintiff feeds approximately 5,000 head of cattle each year (Filing Nos. 79 ¶ 1; 81 ¶ 2; 95, p.1 ¶ 2, p.3 ¶ 1).  In October 2003, plaintiff approached long-time business acquaintance Gailen Gage ("Gage"), an employee of PLMA based in Minnesota, about purchasing some calves (Filing Nos. 81 ¶¶ 3, 5; 95 p.1 ¶¶ 3,6).  Gage, in plaintiff's presence, telephoned Conley, one of Gage's suppliers of feeder calves, in Kentucky and told Conley about plaintiff's interest in procuring cattle.  Gage then handed the phone to the plaintiff so that plaintiff and Conley could work out the exact details of the sale (Filing No. 81 ¶ 5; 95, p.1 ¶ 5).  Plaintiff and Conley thereafter telephonically negotiated the sale of approximately 700 steers ("the steers") (Filing Nos. 1 ¶ 7; 95, p. 12 ¶ 20).  Plaintiff claims that, before agreeing to purchase the steers, he asked Conley about the vaccination history of the steers.  Plaintiff further claims that Conley orally represented to him that the steers had been preconditioned in accordance with the Pfizer Gold Program (Filing No. 95, p.3 ¶ 3).  Conley disputes making this representation and asserts that plaintiff merely wanted to ensure that the steers were subjected to a

preconditioning program -- but not a specific preconditioning program (Filing No. 79 ¶ 3).

The steers were delivered to plaintiff's Minnesota feedlot in October 2003 (Filing Nos. 81 ¶ 7; 95, p.1 ¶ 7). Delivery tickets accompanied all but one of the deliveries of the animals (Filing No. 104 ¶ 5). Some of the delivery tickets that arrived with the steers contained "exclusion of warranties" language that originated from "R.L. Conley Trucking Inc." (*Id*. ¶ 6). This language, which was located on the front of the delivery ticket, mid-way down the ticket, directly below a centered, boldfaced, all-caps, title reading "**EXCLUSION OF WARRANTIES**," provided:

> There are no warranties of any kind which attach to this sale. All warranties are specifically excluded, including warranties of merchanditability [sic], implied warranties: warranties as to fitness or purpose for which the animals are sold. No express warranties are made by the Seller and the animals are purchased and accepted by the Buyer with the full knowledge of the exclusion of all warranties, express, implied or set out in the Uniform Commercial Code.

(Filing No. 78, Ex. 10). Directly beneath this language, there was a bold-type signature line where the buyer was to acknowledge and accept the exclusion of warranties (*Id*.). Of the seven delivery tickets that were submitted to the Court containing the

-3-

exclusion of warranties provision,[1] accounting for approximately 548 of the steers, five of the tickets were signed by the plaintiff, albeit not on the signature line, one was signed by plaintiff's son, and one was signed by Adam Eplig, an individual apparently unknown to the plaintiff (*Id.*). Plaintiff did not reject any of the steers on delivery and did not thereafter revoke his acceptance of the steers (Filing Nos. 81 ¶ 9; 95, p.2 ¶ 9). Conley thereafter submitted bills to PLMA, PLMA paid Conley for the steers, and the plaintiff in turn paid PLMA (Filing No. 104 ¶¶ 7-8). PLMA charged the plaintiff a commission of fifty cents a hundred rate (Filing No. 81 ¶ 10).

By the time the second two shipments of steers were delivered, plaintiff and Gage began to worry that the steers were showing signs of distress. (Filing No. 78, Ex. 4, Gage Dep. p. 18:5 - 19:8; Filing No. 82, Ex. 1, DeLanghe Dep. p. 214:3). Upon sensing problems with the steers, plaintiff contacted his veterinarian, Dr. Scott Kuecker (Filing Nos. 79 ¶ 15; 95, p.7 ¶15). Dr. Kuecker determined that plaintiff's cattle were sick with a number of illnesses, including Type 2-BVD (Filing No. 96 Kuecker Aff. ¶ 6). Dr. Kuecker thereafter vaccinated all of the steers (Filing Nos. 79 ¶ 15; 95, p.7 ¶15). However, approximately 141 steers eventually died (Filing No. 1 ¶ 21). It

---

[1] The Court notes that defendants Conley and Conley Livestock submitted 14 delivery tickets to the Court (Filing No. 78, Ex. 10). Seven of the tickets are duplications.

is unclear which delivery or deliveries of cattle became sick (Filing Nos. 79 ¶ 17; 95, p.7 ¶ 17). The parties dispute whether all of the cattle were preconditioned (Filing Nos. 79 ¶ 4; 95, p.4 ¶4). However, it is undisputed that the cattle that were preconditioned were preconditioned under several different programs (Filing Nos. 96 Kuecker Aff. ¶ 5; 78, Ex. 6 p.1).

Plaintiff commenced this action in June of 2005, seeking to recover approximately $38,500 for vaccination and extra labor costs to test and treat the sick steers, an estimated $132,000 for the loss of 141 head of the steers, and an estimated $30,000 for the lost potential gain on the sick steers at a rate of one-half pound per day. Plaintiff has asserted claims for breach of express warranty, breaches of the implied warranties of merchantability and fitness for a particular purpose and negligent misrepresentation against all the defendants. Plaintiff has also asserted a claim for fraudulent misrepresentation against Conley. Plaintiff seeks punitive damages, pursuant to Minn. Stat. § 549.20, against Conley.

## DISCUSSION

**A.   Choice of Law**

As a preliminary matter, the Court must first determine what state's substantive law applies in this case. Conley argues that Kentucky law applies, while plaintiff argues that Minnesota

law applies.  PLMA is indifferent, arguing that either Kentucky or Minnesota applies.

Federal courts sitting in diversity apply the choice of law principles of the forum state.  *Holden Farms, Inc. v. Hog Slat, Inc.*, 347 F.3d 1055, 1064 (8th Cir. 2003).  Nebraska has adopted the "most significant relationship" test of the Restatement (Second) of Conflict of Laws (1971) to determine the appropriate choice of law for disputes involving contract and tort claims.  *Enron Corp. v. Lawyers Title Ins. Corp.*, 940 F.2d 307, 312 (8th Cir. 1991).

For contract claims, Nebraska courts have adopted § 188 of the Restatement (Second) of Conflict of Laws.  Section 188 of the Restatement provides, absent an effective choice of law by the parties, that "the rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties . . . ."  Restatement (Second) of Conflicts § 188(1) (1971).  The contacts to be considered in determining which state has the most significant relationship include the following:  (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence,

nationality, place of incorporation and place of business of the parties.  Restatement (Second) of Conflicts § 188(2) (1971).

For tort claims, Nebraska courts have adopted § 145 of the Restatement.  *See Malena v. Marriott Intern., Inc.*, 651 N.W.2d 850, 856-57 (Neb. 2002) (applying § 145 of the Restatement).  Section 145 lists general factors to be considered in tort cases, but its commentary suggests following the rules set forth in §§ 146-155, for particular issues in tort.  Restatement (Second) of Conflicts § 145 cmt. a (1971); *see also American Healthnet, Inc. v. Westside Community Hosp., Inc.*, 2006 WL 861334 at *4 (D. Neb. April 3, 2006) (applying § 148 of the Restatement).  Section 148 of the Restatement specifically applies to fraud and misrepresentation.  Pursuant to § 148(2), which applies when the plaintiff's reliance took place in a state other than where the representations were made, as in the present case, the courts are to consider the following contacts in determining what state has the most significant relationship to the occurrence and the parties:  (1) the place or places where the plaintiff acted in reliance upon the defendant's representations; (2) the place where the plaintiff received the representations; (3) the place where the defendant made the representations; (4) the residence or place of business of the parties; (5) the place where the subject matter of the

transactions was situated; and (6) the place where the plaintiff was to render performance.  Restatement (Second) of Conflicts § 148(2) (1971).

Under the contract and misrepresentation Restatement standards, the Court finds that Minnesota has a more significant relationship with plaintiff's claims than Kentucky.  Both the plaintiff and Gailen Gage, the PLMA agent who facilitated the transaction between plaintiff the Conley, are domiciled in Minnesota.  The sale between plaintiff and Conley resulted from a telephone call originating from Minnesota.  The cattle were delivered to Minnesota.  The cattle plaintiff purchased are, or were located at the time of their death, in Minnesota.  And the cattle were ultimately vaccinated and treated by a veterinarian in Minnesota.  Conley alleges that Kentucky has the most significant relationship to the parties and the transaction because the contract was created and performed in Kentucky.  This argument is without merit.  In contracts negotiated by telephone, the place of the contract is the place where the acceptor speaks. *See* 17A Am. Jur. 2d *Contracts* § 101 (2d ed. 2004) ("In the absence of any stipulation by the offeror to the contrary, an acceptance of an offer by telephone is effective, and the contract is created at the place where the acceptor speaks."); *see also* 2 Richard A. Lord, Williston on Contracts § 6.61 (4th ed. 1991).  This contract was undoubtedly accepted by plaintiff

-8-

in Minnesota and was thus created in Minnesota. Furthermore, the place of performance of this contract was Minnesota, not Kentucky. *See American Carpet Mills v. Gunny Corp.*, 649 F.2d 1056, 1059 (5th Cir. 1981) (place where goods were to be delivered was place of performance); *In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 21 F. Supp. 2d 593, 598 (E.D. La. 1998) (in sale of goods transaction, place of delivery is the place of performance); *D.P. Tech. Corp. v. Sherwood Tool, Inc.*, 751 F. Supp. 1038, 1040 n. 3 (D. Conn.1990) (place of performance of contract for sale of computer system was "Connecticut, since the computer system was to be delivered to and used in Connecticut"). For these reasons, the Court concludes that Minnesota law applies to the contract and tort claims presented in this case.

**B.   Defendant PLMA**

Plaintiff has asserted three claims against PLMA: breach of express warranty, breaches of the implied warranties of merchantability and fitness for a particular purpose, and negligent misrepresentation. Plaintiff claims that PLMA is liable under each of these theories because Gage, in referring plaintiff to Conley, gave Conley actual and apparent authority to act as PLMA's agent in procuring the sale of the cattle and thus adopted any representations made by Conley (Filing No. 95, p.20).

PLMA disputes the existence of any agency relationship between it and PLMA.

### 1. Actual Authority

Minnesota courts have adopted the Restatement (Second) of Agency (1957), which defines "agency" as the fiduciary relationship arising from the "manifestation of consent by one person to another," that the other person shall "act on his behalf and subject to his control, and consent by the other to so act." *Plate v. St. Mary's Help of Christians Church*, 520 N.W.2d 17, 20 (Minn. Ct. App. 1994) (quoting Restatement (Second) of Agency § 1 (1957)). The determination of an agency relationship does not depend upon the intent of the parties to create it nor upon the label that they attach to their relationship. *Id*. (citing *PHM Properties v. Nichols*, 263 N.W.2d 799, 803 (Minn. 1978). Rather, as is explained in the comments to § 1 of the Restatement, agency is a legal concept which the law imputes to the factual relation between the parties:

> Agency is a legal concept which depends upon the existence of required factual elements: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking. The relation which the law calls agency does not depend upon the intent of the parties to create it, nor their

> belief that they have done so. To constitute the relation, there must be an agreement, but not necessarily a contract, between the parties; if the agreement results in the factual relation between them to which are attached the legal consequences of agency, an agency exists although the parties did not call it agency and did not intend the legal consequences of the relation to follow.

*PMH*, 263 N.W.2d at 802-03 (citing Restatement (Second) Agency § 1, cmt. b). Whether an agency relationship exists is a question of fact. *Church of the Nativity of Our Lord v. WatPro*, 491 N.W.2d 1, 6 (Minn. 1992). The party claiming existence of the agency relationship bears the burden of proof. *Plate*, 520 N.W.2d at 20. There is no agency, as a matter of law, without persuasive evidence to establish the elements of an agency relationship. *Bacich v. Uzzell*, 2000 WL 760440 at *2 (Minn. Ct. App. June 13, 2000) (citing *Jurek v. Thompson*, 197 N.W.2d 788, 793 (Minn. 1976)).

Having carefully reviewed the factual record in this case, the Court concludes, as a matter of law, that the evidence fails to establish the elements of an agency relationship between PLMA and Conley. First, there was no manifestation of consent by PLMA that Conley would be PLMA's agent for the sale of cattle to plaintiff. PLMA's only involvement in the transaction between plaintiff and Conley, apart from charging a commission for the

-11-

sale, was to arrange for an informal telephone conversation between plaintiff and Conley. Gage, as PLMA's agent, got Conley on the phone, notified Conley of plaintiff's interest in purchasing cattle, and handed the phone over to plaintiff so that plaintiff and Conley could work out the details of the sale. These facts do not support a conclusion that there was any agreement or understanding between PLMA and Conley that Conley would be PLMA's agent for the sale.

Second, and more importantly, there is no evidence that PLMA had any right of control over Conley. As comment b to § 1 of the Restatement explains:

> The agency relation results if, but only if, there is an understanding between the parties which, as interpreted by the court, creates a fiduciary relation in which the fiduciary is subject to the directions of the one on whose account he acts. It is the element of continuous subjection to the will of the principal which distinguishes the agent from other fiduciaries and the agency agreement from other agreements.

There is no evidence that PLMA had the right to control Conley through the negotiation, resulting sale, or delivery of the steers. Conley appears at all times, to have been acting on his own behalf and on behalf of Conley Livestock. For these reasons, the Court finds that no agency relationship existed between PLMA

-12-

and Conley and thus that Conley lacked actual authority to bind PLMA.

### 2. Apparent Authority

Alternatively, plaintiff asserts that PLMA is bound by Conley's representations because Conley had apparent authority to act on behalf of PLMA. A principal is bound not only by an agent's actual authority but also by authority that the principal has apparently delegated to him or her. *Duluth Herald News Tribune v. Plymouth Optical Co.*, 176 N.W.2d 552, 555 (Minn. 1970). "Apparent authority is that authority which a principal holds an agent out as possessing, or knowingly permits an agent to assume." *Foley v. Allard*, 427 N.W.2d 647, 652 (Minn. 1988). To find apparent authority for an agents actions, (1) the principal must have held the agent out as having authority, or must have knowingly permitted the agent to act on its behalf, (2) third parties must have had actual knowledge that the agent was held out by the principal as having such authority or had been permitted by the principal to act on its behalf, and (3) proof of the agents apparent authority must be found in the conduct of the principal, not the agent. *Hockemeyer v. Pooler*, 130 N.W.2d 367, 375 (Minn. 1964). An agent's apparent authority results from statements, conduct, lack of ordinary care, or other manifestations of the principal's consent, whereby third persons are justified in believing that the agent is acting within his

authority.  *McGee v. Breezy Point Estates*, 166 N.W.2d 81, 89 (Minn. 1969).  Therefore, the scope of apparent authority is determined not only by what the principal knows and acquiesces in, but also by what the principal should, in the exercise of ordinary care and prudence, know his agent is doing.  *Id*.

The Court finds that there is no genuine issue of fact from which it could be inferred that PLMA held out Conley as having authority to act on behalf of PLMA or that PLMA knowingly permitted Conley to act on its behalf.[2]

### 3.   Negligent Misrepresentation

Apart from relying on an agency theory, plaintiff also asserts that PLMA is liable for negligent misrepresentation because PLMA had a duty to provide accurate information about the cattle and their vaccination status where PLMA put plaintiff into contact with Conley knowing that plaintiff was looking for Pfizer Gold preconditioned cattle.

To state a claim for negligent misrepresentation the plaintiff must prove the following elements: (1) a duty of reasonable care in conveying information; (2) a breach of that

---

[2] Based on the facts in the record, PLMA's s involvement in the transaction would be aptly characterized as a middleman.  *See* 12 C.J.S. *Brokers* § 8 (2004) ("A middleman is not subject to the rules governing brokers, but is employed merely to bring together parties, who desire to exchange, or buy or sell, property; and in such transaction the middleman's services are not rendered as the agent of either party but he or she merely puts the parties in a position where they may make their own contracts, and may later receive a commission from both."); *see also* 12 Am. Jur. 2d *Brokers* § 208 (2d ed. 1997).

duty by giving false information; (3) reasonable reliance on the misrepresentation, which reliance is the proximate cause of physical injury; and (4) damages.  *Flynn v. American Home Products,* 627 N.W.2d 342, 350-51 (Minn. Ct. App. 2001).

PLMA argues that it cannot be liable for negligent misrepresentation because it was under no duty to convey information to plaintiff about the details of the preconditioning program and because it is undisputed that PLMA did not convey any information to the plaintiff about the preconditioning status of the steers.  The Court agrees with PLMA.  Even if plaintiff were able to prove that PLMA owed plaintiff a duty, plaintiff has not alleged any facts from which the Court could conclude that PLMA breached that duty by negligently giving PLMA false information regarding the preconditioning programs.  All of the details regarding preconditioning of the steers was worked out exclusively between plaintiff and Conley.

In addition, for reasons addressed below, the Court finds that plaintiff's negligent misrepresentation claim is barred by Minnesota's economic loss doctrine.  Accordingly, the Court finds that plaintiff has not stated a negligent misrepresentation claim against PLMA.

4.  For all of the foregoing reasons, PLMA's motion for summary judgment will be granted.

    **c.    Defendants Conley & Conley Livestock**

Plaintiff has asserted claims against the Conley defendants for breach of express warranty, breaches of the implied warranties of merchantability and fitness for a particular purpose, negligent misrepresentation, and punitive damages.  Plaintiff has also asserted a claim against Mr. Conley, individually, for fraudulent misrepresentation.  Conley contends that plaintiff's claims should be dismissed because (1) Conley did not expressly warrant that the cattle would be preconditioned according to the Pfizer Gold program; (2) Conley clearly and conspicuously disclaimed all of the warranties; (3) plaintiff's negligent misrepresentation claimed is barred under Minnesota's economic loss doctrine; and (4) plaintiff did not rely on Conley's alleged fraudulent misrepresentation and because plaintiff has failed to establish that Conley's alleged misrepresentation caused any damage.

Having carefully reviewed the parties' briefs and evidentiary submissions and the applicable law, it is clear that there are issues of material fact as to plaintiff's breach warranty, fraudulent misrepresentation, and punitive damages claims.  Conley's motion for summary judgment as to these claims will, therefore, be denied.  However, for reasons set forth below, Conley's motion as to plaintiff's negligent misrepresentation claim will be granted.

### 1. Negligent Misrepresentation

Conley contends that plaintiff's negligent misrepresentation claim is barred by Minnesota's economic loss doctrine. The Court agrees. Minnesota's economic loss doctrine is currently codified in two statutes: Minn. Stat. § 604.10, which applies to transactions entered into before July 31, 2000; and Minn. Stat. § 604.101, which applies to transactions entered into after on or after August 1, 2000. *See Holden Farms, Inc. v. Hog Slat, Inc.*, 347 F.3d 1055, 1065 n. 5 (8th Cir. 2003); *Kietzer v. Land O'Lakes*, 2002 WL 233746 at *4 (Minn. Ct. App. Feb. 19, 2002); *see also* Daniel S. Kleinberger, Linda J. Rusch & Alan I. Silver, *Building a New Foundation: Torts, Contracts, and the Economic Loss Doctrine*, 57 Bench & B. Minn. 25 (2000). Because the transaction in the present case occurred in October 2003, the principles set forth in Minn. Stat. § 604.101 apply here.

Subdivision 4 of § 604.101 provides that "[a] buyer may not bring a common law misrepresentation claim against a seller relating to the goods sold or leased unless the misrepresentation was made intentionally or recklessly." Minn. Stat. § 604-101 subdiv. 4. The comments to subdivision 4 expressly state that § 604.101 "bar[s] a buyer's claim against a seller for negligent misrepresentation relating to the goods sold or leased." Accordingly, the Court finds that plaintiff's negligent misrepresentation claim should be dismissed.

**CONCLUSION**

In sum, the Court finds (1) that plaintiff's claims against PLMA must be dismissed because plaintiff has failed to establish a genuine issue of fact on the issue of whether PLMA was acting with actual or apparent authority; (2) that plaintiff's negligent misrepresentation claim against PLMA must be dismissed because it is barred by Minnesota's economic loss doctrine and, alternatively, because plaintiff failed to allege any fact from which the Court could conclude that PLMA provided plaintiff with false information regarding the preconditioning programs; (3) that genuine issues of material fact preclude summary judgment on plaintiff's breach of warranty, fraudulent misrepresentation, and punitive damages claims against Conley; and (4) that plaintiff's negligent misrepresentation claim as against all defendants is barred by Minnesota's economic loss doctrine.  Accordingly,

IT IS ORDERED:

1)  Conley's motion for summary judgment (Filing No. 77) is granted as to plaintiff's negligent misrepresentation claim and denied as to all other claims.

      2) PLMA'S motion for summary judgment (Filing No. 80) is granted. This action is dismissed as to PLMA.

      DATED this 29th day of June, 2006.

                      BY THE COURT:

                        /s/ Lyle E. Strom
                        _____
                        LYLE E. STROM, Senior Judge
                        United States District Court